UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PRINCIPAL NATIONAL LIFE INSURANCE COMPANY,<br>    *Plaintiff*,<br>    *v.*<br>EMILY C. COASSIN and THOMAS GIBNEY as Co-Trustees of the LAWRENCE P. COASSIN IRREVOCABLE TRUST dated 6/23/1999,<br>    *Defendants*. | Civil No. 3:13cv1520 (JBA)<br><br>September 25, 2015 |

**RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This is an action by Plaintiff Principal National Life Insurance Company ("Principal") against Emily C. Coassin and Thomas Gibney in their capacities as Co-Trustees of the Lawrence P. Coassin Irrevocable Trust dated 6/23/1999 ("the Trustees"), for rescission of the life insurance policy ("the policy") Principal issued to Larry Coassin and for a declaratory judgment that the Policy is void *ab initio* and Principal is not liable to pay benefits under it.  (Am. Compl. [Doc. # 14].)  Defendants counterclaim for a declaratory judgment that Principal is liable to pay benefits under the Policy and for damages for breach of contract.  (Answer to Am. Compl. [Doc. # 19].) Plaintiff now moves [Doc. # 51] for summary judgment on all of its claims.  Oral argument was held on June 24, 2015.  For the following reasons, Plaintiff's motion is granted in part and denied in part.

**I.**    **Background**

    **A. The Principal Policy**

On April 9, 2012, Larry Coassin submitted an application to Principal for a $10,000,000 life insurance policy to replace a MetLife life insurance policy for $10,000,000 which Mr. Coassin had been issued in 2011.[1]  (*See* Application, Ex. 1 to Ford Decl. [Doc. # 26] at 2.) Among the questions in the application were: No. 18(j) "In the last ten years, have you had, been

---

[1] In replacing the MetLife policy, Mr. Coassin sought to obtain a lower premium. (Wolff Dep., Ex C to Reply [Doc. # 65] at 30.)

treated for or diagnosed as having . . . any disease or disorder of the eyes, ears, nose, throat or skin?," to which Mr. Coassin answered "no" (*id*. at 6); and No. 21 "Date last seen" by primary physician and reason, to which Mr. Coassin responded, "Nov 2011 – sinus infection – all fine now"[2] (*id*. at 7).  On April 17, 2012, Principal issued Policy No. 4701113 ("the Policy") to the Lawrence P. Coassin Revocable Trust dated 6/23/99, effective February 22, 2012 (the Policy was backdated at Mr. Coassin's request), subject to the requirements that Mr. Coassin complete an Amendment form ("the Amendment"), Supplemental Statement of Health ("the Supplement"), and Acknowledgment and Delivery of Receipt, and pay the first annual premium.  (Ford Decl., Ex. A to Pl.'s Loc. R. 56(a)1 Stmt. [Doc. # 52] ¶ 15.)

The Amendment, signed by Mr. Coassin and then-Trustee David Hadden on April 25, 2012, stated: "With application amended to show response to question 18J, Part B; yes, earache with dizziness, lightheadedness and vertigo 12/11.  Resolved completely without recurrence.  No further MD visits needed."  (Amendment, Ex. 2 to Ford Decl. [Doc. # 26])  The Supplement, also signed by Mr. Coassin on April 25, 2012, asked "Have you had any illness or injury or consulted a member of the medical profession since the date of the application?" to which Mr. Coassin responded "no."  (Supplement, Ex. 3 to Ford Decl. [Doc. # 26].)  The Policy was issued the same day.

**B. Medical Records**

On November 23, 2012, a CAT scan of Mr. Coassin's brain revealed a "very aggressive and unusual" brain tumor (Hirokawa Decl., Ex. 1 to Defs.' Loc. R. 56(a)2 Stmt. ¶ 15), from which Mr. Coassin died on July 8, 2013 (*see* Underwriting Referral Form, Ex. 6 to Ford Decl. at 1).  Because Mr. Coassin died within the two year contestability period, Principal "initiated a routine contestable review and requested [Mr.] Coassin's medical records."  (Ford Decl. ¶¶ 25, 27.)  The medical records showed that Mr. Coassin had seen his internist, Dr. Lorenzo Galante on December 15, 2011 for lightheadedness and vertigo, symptoms he told Dr. Galante he had

---

[2] This was apparently an error. The appointment actually appears to have taken place in December 2011.

experienced "in the past on and off" and which had previously been diagnosed as benign positional vertigo ("BPV"). (Med. Records, Am. Ex. 5 to Ford Decl. [Doc. # 52] at 1.) Dr. Galante diagnosed the condition as recurrent BPV and recommended that Mr. Coassin call if he experienced headaches, vomiting, or loss of balance. (*Id*. at 2.)

The medical records also demonstrated that although Mr. Coassin had told Principal that he had not seen any doctors between April 9, 2012, when he submitted his original application, and April 25, 2012, when he submitted the Amendment and Supplement, in fact he had seen two doctors during that period. He saw a cardiologist, Dr. Nadelmann[3] on April 13, 2012 for lightheadedness (*id.* at 3), and an ear, nose, and throat specialist, Dr. Ronald Hirokawa, on April 17, 2012 for dizziness and lightheadedness (*id*. at 7). Dr. Hirokawa noted that Mr. Coassin had been experiencing his symptoms for the previous six months (*id*.), and he ordered three tests to be performed on May 8, 2012: an audiogram, an auditory brain stem response report ("ABR") and a VNG[4] test (Hirokawa Decl. ¶ 5).

After reviewing the results of those tests, Dr. Hirokawa recommended that Mr. Coassin "undergo an MRI scan to rule out a brain problem or nerve problem being the cause of the dizziness he had reported." (*Id*. ¶ 6; *see* Med. Records at 12.) Mr. Coassin underwent the MRI on May 31, 2012. (Med. Records at 13.) The results revealed "[s]light patchy long TR hyperintensity in the frontal lobe white matter" which the radiologist, Richard Becker, believed "likely represent[ed] mild age-related ischemic change," but no "abnormal mass" and "[n]o abnormality . . . in the cerobellopontine angle internal auditory canal regions." (*Id*.) In other words, "nothing was discovered in the area of the brain that [Dr. Hirokawa] had been concerned with – namely, the back of the brain." (Hirokawa Decl. ¶ 7.)

Nonetheless, because the MRI did show an abnormality in the frontal lobe and Mr. Coassin continued to feel dizzy, on June 2, 2012, Dr. Hirokawa recommended Mr. Coassin seek

---

[3] First name unknown.

[4] No definition is given.

3

a neurological consultation. (*Id*. ¶ 9.) Mr. Coassin informed Dr. Hirokawa that his brother-in-law was a neurologist and that he would consult with him. (*Id*. ¶ 10; *see* Med. Records at 14.) Thereafter, in early June 2012, Mr. Coassin contacted his brother-in-law, Dr. Samuel Potolicchio, a professor of neurology at George Washington University who has been practicing neurology for 37 years. (Potolicchio Decl., Ex. 2 to Defs.' Loc. R. 56(a)2 Stmt. ¶¶ 2, 4.) After reviewing Mr. Coassin's MRI scan, which had been sent to him, Dr. Potolicchio concluded that there was no cause for concern, and that in his opinion, the white matter noted by the radiologist was "the result of the aging process and did not in any way have any relationship to any dizziness or vertigo which [Mr. Coassin] had experienced." (*Id*. ¶¶ 7, 9, 10.) Dr. Potolicchio told Mr. Coassin that his "dizziness/vertigo was most probably a benign positional paroxysmal vertigo," a "common condition which is benign," and that "no further investigation was necessary or appropriate based on the symptoms [Mr. Coassin] had reported . . . and/or the MRI scan and the radiologist's report with respect thereto." (*Id*. ¶¶ 8, 18.) However, Dr. Potolicchio's conversation with Mr. Coassin was over the phone, not in person, and it was "not a formal consultation." (*Id*. ¶ 12.)

In November 2012, a second MRI scan revealed a tumor in Mr. Coassin's brain. There is some dispute about whether the tumor *could have been* seen on the May MRI, but there is no evidence that any doctor who viewed the May MRI actually did see the tumor until the second scan was taken in November. (*Compare* Dr. DeAngelis Med. Records, Ex. A to Berns Reply Decl. [Doc. # 65] at 3 ("An MRI from 5/12 without contrast reveals a 4th ventricular mass.") *with* Potolicchio Dep., Ex. 2 to Surreply [Doc. # 69] at 81 (stating that he disagrees that the tumor could be seen in the May MRI).) There also appears to be some dispute about whether the symptoms Mr. Coassin was experiencing in April and May 2012 were consistent with the tumor that was eventually diagnosed, or whether they were unrelated. (*Compare* Dr. DeAngelis Med. Records at 1 (appearing to describe Mr. Coassin's vertigo as an early symptom of the tumor that was eventually discovered) *with* Potolicchio Dep. at 84 ("When Larry came to me, November, December, Larry was pretty sick. He was retching in the morning. He was extremely fatigued,

4

losing weight. . . . In June, he just had dizziness, which really . . . wouldn't even come up on anything except some electrical tests done by the ENT doctor. This tumor was so aggressive that they operated on it . . . and they radiated it and it came right back within weeks. . . . You would think if it were there before, he would have had [retching] early on, but he didn't.").) On July 8, 2013, Mr. Coassin succumbed to the tumor.

### C. Contestability Review

When a policyholder dies within the two-year contestability period, Principal automatically initiates a contestable claim review. (Berns Reply Decl., Ex. A to Reply ¶ 2.) According to Nathan Berns, the Principal employee responsible for conducting the review of Mr. Coassin's application:

> The underwriter performing the contestable review is required to place himself in the shoes of the initial underwriter and determine the underwriting action that would have been taken at the time of the initial underwriting if the insured had disclosed the true facts that were misrepresented or omitted. In other words, based on the information that Principal Life learns after the insured's death, and in accordance with its underwriting guidelines, the contestable reviewer determines whether a policy would have been issued to the applicant at the time of application had the true facts been known and, if so, under what conditions.

(*Id.*) In his report, Mr. Berns noted the following inconsistencies in Mr. Coassin's application: (1) although Mr. Coassin attested in the Amendment that his earache with dizziness, lightheadedness and vertigo had resolved without recurrence after his December 2011 visit to Dr. Galante, Mr. Coassin saw Dr. Hirokawa on April 17, 2012 for dizziness, lightheadedness, and neck pain; and (2) although Mr. Coassin stated in the Supplement that he had not had any illness or injury or consulted a member of the medical profession since the date of his application, in fact he saw Dr. Hirokawa during that time period.[5] (Berns Report, Ex. 6 to Ford Decl. [Doc. # 26] at 2.)

---

[5] He also saw Dr. Nedelmann during that time period, but Mr. Berns was not aware of that visit in writing his report. (*See* Berns Decl. ¶ 16 n.2.) The report noted a third inconsistency as well but it states that this inconsistency "didn't have an impact on [the] underwriting decision." (Berns Report at 3.)

According to Mr. Berns, had Principal been aware of the true facts in April 2012, it "would have requested records from the April 17, 2012 visit with Dr. Hirokawa" and then "waited for the results of the scheduled testing" on May 8, 2012 and May 31, 2012. (*Id*. at 3.) However, when Dr. Hirokawa advised Mr. Coassin to see a neurologist on June 2, 2012, Principal would have declined coverage. (*Id*.) Mr. Berns explained that "due to the fact that [on June 2, 2012] Mr. Coassin continued to be medically assessed for ongoing symptoms, Principal Life could not properly evaluate the risk that it would assume in offering life insurance coverage to Mr. Coassin, nor could it determine if it would be willing to accept such risk." (Berns Decl., Ex. B to Pl.'s Loc. R. 56(a)1 Stmt. ¶ 17.) In reaching this determination, Mr. Berns relied on the Swiss Reinsurance ("Swiss Re") underwriting guidelines. (*Id*. ¶ 18.)

Under the guidelines, positional vertigo is defined as "a benign but inconvenient problem in which vertigo is precipitated by positioning the head to one side while recumbent." (Guidelines, Ex. 16 to Defs.' Loc. R. 56(a)2 Stmt. at 13.) If an individual has vertigo, the underwriter must first determine if the condition is "fully investigated" or not. (*See* Berns Cont. Dep., Ex. G to Pl.'s Loc. R. 56(a)1 Stmt. at 155–56.) A condition is "fully investigated" if there are "no ongoing referrals, recommendations to see additional physicians," and there is a "definitive diagnosis." (*Id*. at 156.) If the vertigo has been fully investigated and more than six months have elapsed since the onset of symptoms, the guidelines direct underwriters to issue a standard premium rate or to "exercise judgment" in granting a preferred rate. (*Id*. at 155; *see* Guidelines at 12.) If the vertigo has been fully investigated and six months or less have elapsed since the onset of symptoms, or if the vertigo has not been fully investigated, the guidelines direct underwriters to postpone issuing a policy. (Berns Cont. Dep. at 156; *see* Guidelines at 12.) Mr. Berns testified that because Mr. Coassin was advised to seek a neurological consult on June 2, 2012, Principal would have "consider[ed] the cause [of the vertigo] to be not investigated" and would have declined coverage. (Berns Decl. ¶¶ 18–19.) On the basis of Mr. Berns's recommendations, on October 16, 2013, Principal determined that the claim on Mr. Coassin's

policy was "not payable," and that the Policy was void ab initio.  (Declination Ltr., Ex. 7 to Ford Decl. at 1, 5.)  This lawsuit followed.

## II.     Discussion[6]

"Under Connecticut law, an insurance policy may be voided by the insurer if" the insurer "prove[s] three elements: (1) a misrepresentation (or untrue statement) by the plaintiff which was (2) knowingly made and (3) material to [the insurer's] decision whether to insure."[7]  *Pinette v. Assurance Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 1995).  Each of these elements is contested in this case.

### A. Misrepresentation

"For a material misrepresentation to render a contract voidable under Connecticut law, the misrepresenting party must know that he is making a false statement.  'Innocent' misrepresentations—those made because of ignorance, mistake, or negligence—are not sufficient grounds for rescission."  *Id.* at 409–10.  Further, "[w]here a question in [an insurance] application is ambiguously worded and the applicant 'could reasonably have understood the question as calling for a particular response, and the response given in accordance with that understanding is not false, the response does not amount to a misrepresentation.'"  *F.D.I.C. v.*

---

[6] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

[7] Because the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, it applies the law of the forum state.  *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012) (citing  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

*Great Am. Ins. Co.*, 607 F.3d 288, 294–95 (2d Cir. 2010) (quoting *Middlesex Mut. Assurance Co. v. Walsh*, 218 Conn. 681, 695 (1991)).

Here, Plaintiff alleges that Mr. Coassin's responses to the Amendment and the Supplement were knowing misrepresentations. (Mem. Supp. Mot. for Summ. J. [Doc. # 51] at 9.) Defendants argue that there is a genuine issue of material fact on this issue. (Opp'n to Mot. for Summ. J. at 23.)

### 1. The Amendment

The Amendment that Mr. Coassin signed stated: "With application amended to show response to question 18J, Part B; yes, earache with dizziness, lightheadedness and vertigo 12/11. Resolved completely without recurrence. No further MD visits needed." (Amendment.) Question 18J, in turn, read: "In the last ten years, have you had, been treated for or diagnosed as having . . . any disease or disorder of the eyes, ears, nose, throat or skin?" (Application at 6.) Defendants contend that "the primary reason for the December 2011 visit listed in the Amendment—the earache—resolved completely and without reoccurrence, and . . . the earache required no further medical attention after December 2011," so the Amendment was substantially truthful. (Opp'n at 23.) It was reasonable, Defendants claim, for Mr. Coassin to believe the Amendment was concerned primarily with his earache because the Amendment pertained to a question that asked about diseases or disorders of the eyes, ears, nose, throat or skin. (*Id.*)

This argument is, however, unavailing for several reasons. First, the interpretation of the Amendment urged by Defendants ignores the plain language of the Amendment. Mr. Coassin continued to experience three of the four symptoms listed in the Amendment after his December 2011 appointment. His medical records reveal that he saw Dr. Nadelmann on April 13, 2012 for lightheadedness and Dr. Hirokawa on April 17, 2012 for weakness/fatigue, off balance/dizziness, and lightheadedness, and that because of these symptoms, on April 17, 2012, Dr. Hirokawa referred him for further testing to be conducted on May 8, 2012. (*See* Med. Records at 3, 5, 8, 9.) While it is true that Question 18J asked specifically about disorders of the eyes, ears, nose,

8

throat or skin, the Amendment was broader, explicitly affirming that Mr. Coassin's dizziness, lightheadedness and vertigo had resolved.  It is not plausible, let alone reasonable, that Mr. Coassin read the Amendment to refer only to his earache.

Moreover, it does not appear from the medical records that Mr. Coassin's earache was even the primary reason he saw Dr. Galante in December 2011.  Under "reason for appointment," Dr. Galante wrote only "lightheaded."  (*Id*. at 1.)  Under "assessments," he listed: "dizziness" (along with the notation "primary"), and then vertigo, hypertension, and earache. (*Id*.)  In light of all this, the Court finds no basis for concluding either that Mr. Coassin's response to the Amendment was substantially truthful or that there is any disputed fact requiring resolution by trial on that element.

### 2. The Supplement

Nor is there evidence supporting Defendants' claim that Mr. Coassin's response to the Supplement was substantially true. The Supplement asked "[h]ave you had any illness or injury or consulted a member of the medical profession since the date of the application?" to which Mr. Coassin responded "no." (Supplement.)  It is undisputed, however, that Mr. Coassin saw *two* doctors in the two weeks between completing the application and the Supplement.  Defendants attempt to explain this discrepancy by arguing that "[i]n answering the question . . ., Larry Coassin very well could have believed that Principal just wanted to make sure that he had not experienced any significant new illnesses or injuries . . . or seen a medical professional with respect to such a new illness or injury." (Opp'n at 25.)  But, there is no basis for such an interpretation in the language of the question.  The question is not ambiguous or confusing, and there is nothing in the question to suggest that Principal was interested only in doctors' appointments related to "new illness[es] or injur[ies]."

Under any reasonable interpretation of the Amendment and the Supplement, Mr. Coassin's responses were untrue and constituted misrepresentations.  No reasonable factfinder could find otherwise.

### B. Knowing

The question thus becomes whether Mr. Coassin's misrepresentations were "knowing." If Mr. Coassin's untrue responses to the Amendment and the Supplement were the result of mere negligence, Principal has not demonstrated a knowing misrepresentation. *See Pinette,* 52 F.3d 407 at 409–10. For example, "[a]n applicant may have had some ailment or indisposition of so slight and temporary a character as to have left no impress upon his memory, in which event he could honestly answer in the negative an inquiry if he had been ill." *State Bank & Trust Co. v. Connecticut General Life Ins. Co.*, 145 A. 565, 567 (Conn. 1929); *see Walsh*, 218 Conn. at 692 (reaffirming "the continuing viability of the principles announced in State Bank"). That is not the case here, however.

In the short span of two weeks, Mr. Coassin saw not just one but two doctors for the same symptoms, and those symptoms were worrying enough to one of the doctors to cause him to order further testing. The second of the two appointments was just eight days before Mr. Coassin signed the Amendment and the Supplement attesting that he had not seen any doctors in the previous two weeks and that his symptoms had resolved. In these circumstances, no reasonable factfinder could conclude that Mr. Coassin's misrepresentations were not "knowing."

### C. Materiality

Although the Court has determined that there is no genuine factual dispute as to whether Mr. Coassin's responses were knowing misrepresentations, the issue of their materiality remains. Under Connecticut law, "a fact is material if 'it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.'" *Great Am. Ins. Co.*, 607 F.3d at 295 (quoting *Pinette*, 52 F.3d at 411). "'The test of materiality is in the effect which the knowledge of the fact in question would have on the making of the contract.'" *Quinn v. Fed. Kemper Life Assur. Co.,* 99 F.3d 402, at *2 (2d Cir. 1995) (unpublished opinion) (quoting *State Bank*, 145 A. at 566).

Plaintiff posits that the Connecticut Supreme Court's holding in *State Bank* that "[m]atters made the subject of special inquiry" on an insurance application are "deemed

10

conclusively material" means that no inquiry into the facts is necessary or appropriate here.[8]  145 A. at 566.  *State Bank* was decided in 1929, and although the Connecticut Supreme Court reaffirmed its vitality as recently as 1991, it did so in the context of a case that did not reach the issue of materiality.  S*ee Walsh*, 218 Conn. at 692.  The most recent Connecticut Supreme Court case discussing materiality was *Guariglia v. John Hancock Mut. Life Ins. Co.*, 139 Conn. 54, 57 (1952), decided more than 60 years ago.

However, the Second Circuit, citing *State Bank*, has held that "Connecticut caselaw strongly suggests that an answer to a question on an insurance application is *presumptively* material," *Pinette*, 52 F.3d at 411 (emphasis added); *see also Great Am. Ins. Co.*, 607 F.3d at 295 ("[Because the insured's] prior losses were the subject of specific inquiry, [the insured's] response is presumptively material."), and an inquiry into whether the insurer would have issued the policy had the applicant been truthful on the application is therefore appropriate, *see Quinn*, 99 F.3d at *2 ("As Kemper would not have issued the preferred policy to Albert Quinn had he answered the questions truthfully, the misrepresentations were material as a matter of law.").

Although, as a court sitting in diversity, this Court must apply Connecticut law, *Erie R.R. v. Tompkins*, 304 U.S. 64, 80 (1938); 28 U.S.C. § 1652 (1988), the Court is also mindful that "[w]hen a higher federal court has ruled on a particular point of state law, a lower court must ordinarily follow that decision in the absence of an intervening, authoritative state decision,"

---

[8] Defendants argued at oral argument that *State Bank* can be distinguished from this case because *State Bank* involved a "non-medical policy" (i.e. a policy in which the insurance company does not perform a medical exam of the applicant) whereas Mr. Coassin had a medical policy.  This argument is, however, foreclosed by the Second Circuit's decision in *Quinn*, which specifically rejected this distinction.  *See* 99 F.3d at *2 ("The fact that Quinn's insurance was a 'medical' policy . . . does not change th[e] conclusion [that Quinn had made material misrepresentations on his application by omitting from his life insurance application information about his heart condition].").

Defendants also claimed at oral argument, citing *Couch on Insurance*, that this case can be distinguished from *State Bank* because Mr. Coassin's answers were "representations" and not "warranties."  However, *Couch* itself dismisses the relevance of this distinction in Connecticut, writing that in states following Connecticut's "specific inquiry" rule, "the distinctions between representations and warranties has less importance, for even though the statements are representations, they will have the effect of avoiding the policy without regard to their actual materiality."  6 *Couch on Ins*. § 81:36.

17A *Moore's Federal Practice – Civil* § 124.22.  Following Second Circuit precedent, the Court finds that Mr. Coassin's answers on his life insurance application were presumptively material, and turns to the question of whether Principal would have issued the policy had it known the true facts when it issued the policy.

> Plaintiff contends, relying on the opinion of its underwriter, Nathan Berns, that:
>
> [T]he Policy would not have been issued if Principal Life had known the true facts pertaining to Coassin's medical condition and treatment, i.e. that Coassin had visited physicians and undergone testing for the symptoms he reported as completely resolved.  The reason that coverage would have been declined is that, due to the fact that Mr. Coassin continued to be medically assessed for ongoing medical symptoms, Principal Life could not properly evaluate the risk that it would assume in offering life insurance coverage to Mr. Coassin, nor could it determine it would be willing to accept such risk.  Instead, Principal Life would have awaited the results of the testing that had been ordered by Coassin's physical on April 17, 2012.  Upon learning that, based on the results of the tests conducted on May 8, and 31, 2012, Coassin's physician had ordered additional medical consultation, Principal Life would have declined coverage and required Coassin to provide records showing complete resolution of the ongoing symptoms with any future application. . . .  Had Coassin accurately and completely disclosed, at the time of [the] Application, the Amendment to [the] Application and Supplemental Statement, his true symptoms, the fact that he had consulted a medical professional for those symptoms, and that further testing and evaluation had been recommended, Principal Life would have declined to issue the Policy on Coassin's life.

(Berns Decl. ¶¶ 17, 19 (emphases omitted).)

Defendants claim, to the contrary, that Principal would have issued Mr. Coassin a policy at the preferred rate even if it had been aware of the misrepresentations on his application. (Opp'n at 30.)  In support of this contention, Defendants offer the expert testimony of Don Kelley, an attorney who has "specialized in matters concerning insurance" since "first being admitted to practice in 1968," has "served as house counsel for some of the largest insurers in the country," and has "qualified and testified as an expert witness in insurance-related cases on more than 60 occasions in both federal and state courts." (Kelley Decl., Ex. 3 to Opp'n ¶¶ 3–4.)  Mr. Kelley testified that in his opinion, "[h]ad Principal known of Larry Coassin's pre-April 25, 2012 medical history, it would have issued the Policy." (*Id*. ¶ 6.)  Mr. Kelley explained:

> The May 31, 2012 Radiological Consultant Report, upon which Dr. Hirokawa bases his June 2, 2012 recommendation that Mr. Coassin consult a neurologist, and upon which Nathan Berns bases his opinion, diagnosed Mr. Coassin's condition as "vertigo." Reference to Principal's underwriting guidelines for "vertigo, cause unknown" discloses that the correct underwriting action would have been to postpone a decision on the Application rather than to decline it as stated by Nathan Berns. Had Principal merely postponed its decision as directed by its own guidelines and had [it] conducted a reasonable investigation into the meaning of Dr. Hirokawa's recommendation, Principal would have learned that Mr. Coassin intended to consult with his brother-in-law, Dr. Samuel J. Potolicchio, a neurologist.
>
> Had Principal contacted Dr. Potolicchio, it would have learned of Dr. Potolicchio's interpretation of the May 31, 2012 MRI, that the observed white matter was a normal result of the aging process, was of no medical significance, and that no further investigation was indicated. Principal also would have learned that Dr. Potolicchio's opinion was that Larry Coassin's dizziness/vertigo was most probably a benign positional paroxysmal vertigo, a common benign condition which would have had no impact on his life expectancy.
>
> If Principal had inquired further of Dr. Hirokawa, it would have learned, as set forth in Dr. Hirokawa's Declaration, that beyond recommending that Larry Coassin consult with a neurologist, Dr. Hirokawa had no plan to treat Mr. Coassin any further. In his declaration, Dr. Hirokawa stated that if he had had the benefit of Dr. Potolicchio's Declaration, he would have diagnosed Mr. Coassin's condition as benign positional vertigo and would have so advised Principal had Principal contacted him.

(*Id.* ¶¶ 13–15.)

Plaintiff disparages Mr. Kelley's conclusion as having "no basis in fact," alleging that "Mr. Kelley's opinion is simply a conclusory assertion based on speculation as to what Principal Life would have done under a hypothetical set of circumstances that did not occur." (Reply at 8.) But, of course, this is the same exercise that Principal engages in when it puts forward Mr. Berns's statements as evidence that Principal would not have issued the Policy had Mr. Coassin disclosed the truth in his application.

Principal additionally argues that (1) it would not have accepted Dr. Potolicchio's verbal opinion about the MRI scan formed without the benefit of an in-person exam, and (2) even if Principal had obtained and accepted Dr. Potolicchio's and Dr. Hirokawa's opinions that Mr.

Coassin was suffering from BPV, it would not have issued the policy absent proof of "resolution of the symptoms without recurrence."[9] (Reply at 9.)

These arguments are not availing. Neither party has submitted any evidence about Principal's past practices with regard to accepting verbal opinions from physicians. Based on the testimony of Mr. Kelley and Mr. Berns, there is at least a genuine issue of disputed material fact as to whether Dr. Potolicchio's opinion would have been accepted. There is also a dispute of fact about whether Principal would have, on the basis of Dr. Potolicchio and Dr. Hirokawa's opinions, issued the policy. Dr. Hirokawa confirms in his declaration that had he "been presented with Dr. Potolicchio's conclusions" in early June 2012, he would have diagnosed Mr. Coassin as having BPV. (Hirokawa Decl. ¶ 13.) Had Mr. Coassin been diagnosed as having BPV, a reasonable factfinder could conclude that Principal would have issued the policy. Principal's contentions to the contrary are belied by its own testimony and underwriting guidelines. Although Principal claims that it would not have issued the policy as long as Mr. Coassin's symptoms continued, Mr. Berns testified that in fact "[p]eople go on with benign positional vertigo and they are just fine and we issue [them] preferred policies." (Berns Cont. Dep. at 158.) Indeed, the underwriting guidelines expressly provide for coverage of individuals experiencing vertigo for six months or more, as long as the cause of the symptoms has been fully investigated (defined by Mr. Berns as "no ongoing referrals, recommendations to go see additional physicians[;] there's a definitive diagnosis" (Berns Cont. Dep. at 156)). (*See* Guidelines at 12).

There is, therefore a genuine dispute of material fact as to whether Principal would have issued Mr. Coassin the policy if it had known the true facts which he misrepresented on his application. For that reason, summary judgment is not appropriate.

---

[9] Principal additionally argues that "[t]he parties do not disagree that the policy would not have been placed in force on [April 25, 2012] had Principal life known the true facts" because the underwriter would have at the very least postponed issuing a policy. (Reply at 10.) Whether the Policy would have issued on April 25, 2012 or June 6, 2012, if it would have been issued, Mr. Coassin's omissions would not have been material as a matter of law.

### D.  Waiver

Defendants' final argument is that Principal waived its right to rescind the policy by agreeing to make the policy retroactive to February 22, 2012.  (Opp'n at 27.)  Defendants contend that because "Principal collected premiums on this Policy beginning from February, 2012," it "cannot claim that a doctors' visit after the Application was filed, and three months after the Policy was (retroactively) effective can be material."  (*Id.*)  Defendants rely on three cases from North Carolina, Kentucky, and Maryland., applying those states' laws.  *See Drain v. United Servs. Life Ins. Co.*, 85 N.C. App. 174 (1987); *State Farm Mut. Auto. Ins. Co. v. Davie*, 747 S.W.2d 604 (Ky. Ct. App. 1987); *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md. App. 431 (1986).

In *Davie* and *Ehrhardt*, involving automobile insurers' refusals to pay benefits for car accidents where lapsed policies had been reinstated after the accidents and backdated.  In both cases, the courts held that by backdating the policies to a pre-accident date, knowing of the accidents, the insurance companies waived their rights to refuse coverage for the accidents.  *See Davie*, 747 S.W.2d at 607; *Ehrhardt*, 69 Md. App. at 447.  In *Drain*, an insurance company's letter informing an individual that he was insured was found to have effectively backdated the policy to the date of the letter even though the individual had not yet paid his first premium.  85 N.C. App. at 181.

These cases do not support Defendants' arguments. Here, there is no dispute that the insurer was unaware of misrepresentations in the application, such that its backdating of the policy cannot be deemed to have been a knowing waiver, and Defendants' argument thus fails. *See Murtha*, 2001 WL 256145, at *6 ("Generally, under Connecticut law, '[w]aiver is the intentional relinquishment of a known right. To constitute waiver there must be both knowledge of the existence of the right and intention to relinquish it.'" (quoting *Novella v. Hartford Accident & Indem. Co.*, 163 Conn. 552, 561–62 (1972))).

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion [Doc. # 51] for Summary Judgment is GRANTED as to the question of whether Mr. Coassin knowingly misrepresented information on his insurance application and DENIED as to the question of the materiality of the misrepresentations.

                                IT IS SO ORDERED.

                                /s/
                              Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of September, 2015.