UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PRINCIPAL NATIONAL LIFE INSURANCE COMPANY,<br>    *Plaintiff*,<br>v.<br>EMILY C. COASSIN and THOMAS GIBNEY as Co-Trustees of the LAWRENCE P. COASSIN IRREVOCABLE TRUST dated 6/23/1999,<br>    *Defendants*. | Civil No. 3:13cv1520 (JBA)<br><br>July 25, 2016 |

**MEMORANDUM OF DECISION**

On June 14 through 17, 2016, the Court held a bench trial on Plaintiff Principal National Life Insurance Company ("Principal")'s action against Defendants Emily C. Coassin and Thomas Gibney in their capacities as Co-Trustees of the Lawrence P. Coassin Irrevocable Trust dated 6/23/1999 ("the Trustees"), for rescission of the life insurance policy ("the Policy") Principal issued to Larry Coassin and for a declaratory judgment that the Policy is void *ab initio* and Principal is not liable to pay benefits under it, as well as Defendants' cross-claim for breach of contract and a declaratory judgment of the Trustee's and Trust's rights under the policy. For the following reasons, the Court concludes that Mr. Coassin's knowing misrepresentations on his life insurance application were not material, and as such, the Policy was not void ab initio and Principal did not have a right to rescind it. Judgment is entered in Defendants' favor on its cross-claim.

**I. Background**

The following background facts were established at the summary judgment stage. On April 9, 2012, Larry Coassin submitted an application to Principal for a $10,000,000 life insurance policy at a preferred rate to replace a MetLife life insurance policy for $10,000,000 which Mr. Coassin had been issued in 2011. (*See* Ruling Mot. Summ. J. [Doc. # 90] at 1–2; Policy, Pl.'s Trial Ex. 1.) Among

the questions in the application were: No. 18(j) "In the last ten years, have you had, been treated for or diagnosed as having . . . any disease or disorder of the eyes, ears, nose, throat or skin?," to which Mr. Coassin answered "no"; and No. 21 "Date last seen" by primary physician and reason, to which Mr. Coassin responded, "Nov 2011 – sinus infection – all fine now."[1] (Ruling Mot. Summ. J. at 2; Policy at 28–29). On April 17, 2012, Principal issued Policy No. 4701113 ("the Policy") to the Lawrence P. Coassin Revocable Trust dated 6/23/99, effective February 22, 2012 (the Policy was backdated at Mr. Coassin's request), subject to the requirements that Mr. Coassin complete an Amendment form ("the Amendment"), Supplemental Statement of Health ("the Supplement"), and Acknowledgment and Delivery of Receipt, and pay the first annual premium. (Ruling Mot. Summ. J. at 2.)

The Amendment, signed by Mr. Coassin and then-Trustee David Hadden on April 25, 2012, stated: "With application amended to show response to question 18J, Part B; yes, earache with dizziness, lightheadedness and vertigo 12/11. Resolved completely without recurrence. No further MD visits needed." (*Id.* at 2; *see* Policy at 21.) The Supplement, also signed by Mr. Coassin on April 25, 2012, asked "Have you had any illness or injury or consulted a member of the medical profession since the date of the application?" to which Mr. Coassin responded "no." (Ruling Mot. Summ J. at 2; *see* Policy at 22.) The Policy was issued the same day. (Ruling Mot. Summ. J. at 2; see Policy Issuance, Pl.'s Trial Ex. 43.)

In fact, the Court found at summary judgment, Mr. Coassin continued to experience three of the four symptoms listed in the Amendment after his December 2011 appointment, and he saw

---

[1] This was apparently an error. The appointment actually appears to have taken place in December 2011.

2

Dr. Hirokawa on April 17, 2012 (after the date of his April 9, 2012 application and before he signed the April 25, 2012 Amendment). (Ruling Mot. Summ. J. at 10, 11.) His medical records reveal that he saw Dr. Hirokawa for weakness/fatigue, off balance/dizziness, and lightheadedness, and that because of these symptoms, on April 17, 2012, Dr. Hirokawa referred him for further testing to be conducted on May 8, 2012. (*Id.*; *see* Hirokawa Record Apr. 17, 2012, Pl.'s Trial Ex. 4; Auditory Test Results, Pl.'s Trial Ex. 5.) The Court thus concluded that Mr. Coassin had made knowing misrepresentations in his application. (Ruling Mot. Summ. J. at 10–11.) However, the Court found genuine issues of material fact with respect to the question of whether Mr. Coassin's knowing misrepresentations were material, thus necessitating a trial, which addressed only the narrow issue of materiality.[2]

## II. Findings of Fact and Conclusions of Law

In making its findings of fact and conclusions of law, the Court applies the following standard of materiality, which it adopted in its summary judgment ruling:

> Under Connecticut law, "a fact is material if 'it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.'" *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 295 (2d Cir. 2010) (quoting *Pinette v. Assurance Co. of Am.*, 52 F.3d 407, 411 (2d Cir. 1995)). "'The test of materiality is in the effect which the knowledge of the fact in question would have on the making of the contract.'" *Quinn v. Fed. Kemper Life Assur. Co.*, 99 F.3d 402, at *2 (2d Cir. 1995) (unpublished opinion) (quoting *State Bank & Trust Co. v. Connecticut General Life Ins. Co.*, 145 A. 565, 566 (Conn. 1929)). . . . [A]n answer to a question on an insurance application is *presumptively* material," *Pinette*, 52 F.3d at 411 (emphasis added); *see also Great Am. Ins. Co.*, 607 F.3d at 295 ("[Because the insured's] prior losses were the subject of specific inquiry,

---

[2] "Under Connecticut law, an insurance policy may be voided by the insurer if" the insurer "prove[s] three elements: (1) a misrepresentation (or untrue statement) by the plaintiff which was (2) knowingly made and (3) material to [the insurer's] decision whether to insure." *Pinette*, 52 F.3d at 409.

[the insured's] response is presumptively material."), and an inquiry into whether the insurer would have issued the policy had the applicant been truthful on the application is therefore appropriate, *see Quinn*, 99 F.3d at *2 ("As Kemper would not have issued the preferred policy to Albert Quinn had he answered the questions truthfully, the misrepresentations were material as a matter of law.").

Because the Court already held in its summary judgment ruling that Mr. Coassin had made knowing misrepresentations in response to questions on his application, a presumption of materiality applies. The burden is thus on Defendants to prove, by a preponderance of the evidence, that Mr. Coassin's misrepresentations were not material.

With that legal standard in mind, the Court makes the following findings of fact and conclusions of law, based on the evidence presented at trial, with respect to: (1) Mr. Coassin's medical history up to June 2012[3]; (2) Principal's contestability review; (3) the relevant guidelines; (4) whether Principal would have issued the Policy had it known the true facts; and (4) Defendants' cross-claim for breach of contract.

### A. Coassin's Medical History

On December 15, 2011, Mr. Coassin saw Dr. Lorenzo Galante, who was his primary care physician at the time, for lightheadedness. (Galante Record Dec. 15, 2011, Defs.' Trial Ex. 504. at 1.) His records note under "History of Present Illness" that Mr. Coassin was complaining of vertigo which he claimed he had experienced "in the past on and off" and which he had previously been told was benign positional vertigo ("BPV"). (*Id.*) Under "Examination," Dr. Galante noted that he had been "able to reproduce vertigo in the office" when he asked Mr. Coassin "to sit up from [a]

---

[3] The Court ruled on January 15, 2016 that only records regarding Mr. Coassin's health in or prior to June 2012 are relevant because of Principal's position that it would have declined to issue the policy by that time. (*See* Ruling Mot. Limine [Doc. # 112].)

laying down position." (*Id.*) Under "Assessments," he wrote, as relevant here, "Dizziness" and "Vertigo." (*Id.*) Finally, under "Treatment," he noted: "This is recurrent BPV, the Differential diagnosis was described/discussed to the [patient] and he declines necessity to eval[uate] with other tests recommended: labs ecg etc. . . he states [he] had a life insurance exam [with] labs ecg 1 week ago and everything is normal." (*Id.* at 2.)

Four months later, on April 17, 2012, Mr. Coassin saw Dr. Ronald Hirokawa, a head and neck surgery specialist and an ear, nose, and throat ("ENT") specialist, at his office in Ansonia for dizziness and lightheadedness, which he said he had been experiencing for the past six months. (*See* Hirokawa Record Apr. 17, 2012.) Mr. Coassin reported (as memorialized in Dr. Hirokawa's notes) that his symptoms occurred when he stood up, and that they were worse in the mornings. (*Id.*) He also reported neck pain on his left side which radiated to his left ear. (*Id.*) Dr. Hirokawa's examination of Mr. Coassin revealed nothing remarkable, but he nonetheless ordered a basic audiometric test, a videonystagmography ("VNG") test, and an auditory brainstem response ("ABR") test to be performed in his office on May 8, 2012. (*Id.*) He explained at trial that he ordered the testing to determine the cause of Mr. Coassin's dizziness because it was atypical for someone to experience dizziness for such a long period of time.

The results of the tests, conducted by audiologist P. DeWitt, were as follows. The basic audiogram, which Dr. Hirokawa testified is essentially a hearing test, revealed normal tympanograms on both ears, indicating normal middle ear functioning. (*See* Auditory Test Results at 7.) The ABR test, which measures how quickly a sound signal goes from the ear to the brain, revealed normal left and right ears, but when both ears were tested, there was some delay in III-V interpeak latency. (*See id.* at 2.) Dr. Hirokawa testified that the difference in the ranges was 0.24 (*see id.* at 3), which is very slightly above where it should have been. Neurologist Dr. Samuel

5

Potolicchio added that the results were "so border-line" they "were almost normal." However, the audiologist determined that based on the results, retrocochlear (meaning between the inner ear and brain) pathology could not be ruled out. (*Id.* at 2.) In other words, according to Dr. Hirokawa, the audiologist could not determine based only on the testing whether there was a problem in the nerve that carries the signal from the ear to the brain or in the brain itself. The audiologist recommended that Mr. Coassin follow up with Dr. Hirowkawa. (*Id.*)

The VNG test, the final test the audiologist conducted, was actually a series of tests used to determine if there is a normal response between the inner ear and brain. Of the VNG tests the audiologist performed, two returned abnormal results: the Dix-Hallpike Right and the Positional Head tests. (*See id.* at 1.) The Dix-Hallpike Right test entailed suddenly thrusting Mr. Coassin in a backwards position while he was lying on his back, on the right side. When this was performed, Mr. Coassin's eyes flickered to the left, then came back to the right, and then went back left. When the test was repeated, however, this did not occur. (*See id.*) The audiologist reported that this was a "non-localizing sign," meaning (as Dr. Hirokawa testified) that the testing did not reveal whether Mr. Coassin had only an inner-ear problem or something else. (*See id.*) The positional head test showed a "down-beating nystagmus" in the supine position (*id.*), a result Dr. Hirokawa testified was not commonly associated with BPV, but which, Dr. Potolicchio asserted was sometimes seen in people with BPV. Additionally, Mr. Coassin reported significant dizziness when he lay down during the test. (*Id.*) The audiologist noted: "This is a sign of [a central nervous system ('CNS')] lesion" (*id.*), though Dr. Hirokawa was somewhat more equivocal in his testimony, stating that it could be sign of a CNS lesion.

Dr. Hirokawa spoke with Mr. Coassin on the phone on May 10, 2012, at which time he told him that the VNG test results were abnormal, there was a question about whether he had a central

6

nervous system abnormality or lesion, and that based on the ABR test results, a retrocochlear lesion could not be ruled out. (*See* Hirokawa Notes May 10, 2012, Defs.' Trial Ex. 513 & Pl.'s Trial Ex. 6.) As a result, he ordered an MRI, which was conducted by radiologist Richard Becker on May 31, 2012. (*See* Radiology Report, Pl.'s Trial Ex. 7.) Dr. Becker's report notes a diagnosis of vertigo, and states that an MRI without contrast was performed and revealed "[s]light patchy long TR hyperintensity in the frontal lobe." (*Id.*) Although this "white matter" was "nonspecific," Dr. Becker stated that it "likely represent[ed] mild age-related ischemic change." (*Id.*) He added that "[d]emyelinating disease and other possibilities are considered less likely although not excluded." (*Id.*) Finally, he noted, "[n]o abnormal mass is seen." (*Id.*)

Dr. Hirokawa testified that he had ordered the MRI because he wanted to look at the posterior aspect of the brain, which is where one would generally expect to see something causing vertigo or dizziness. While the scan revealed nothing in the posterior part of the brain and no indication of a tumor or lesion, the MRI was "not exactly normal," and so when Dr. Hirokawa spoke to Mr. Coassin on June 2, 2012, he recommended that he seek a consult with a neurologist. (*See* Hirokawa Notes June 2, 2012, Pl.'s Trial Ex. 8.) Mr. Coassin responded that he had a brother-in-law who was a neurologist, and Dr. Hirokawa thus recorded in his records "Rec: Neurology consult (Brother-in-Law)." (*Id.*)

On the weekend of June 2, 2012, Mr. Coassin's wife, Emily Coassin, fedexed Mr. Coassin's MRI results to his brother-in-law, Dr. Samuel Potolicchio, who spoke with Mr. Coassin on the phone a day or two later (Dr. Potolicchio did not examine Mr. Coassin[4]). He testified that during

---

[4] Dr. Potolicchio testified, however, that had he examined Mr. Coassin, he would have performed the same tests Mr. Coassin had already undergone (the basic audiometric test, the VNG test, and the ABR test).

7

that conversation, he told Mr. Coassin that his MRI was for the most part normal. There was no structural lesion in the brain to suggest a tumor. The only reported finding, tiny white spots, were, he said, very common and non-specific (in other words, one could see such spots in people who are ageing, people with migraines, etc.). Although Dr. Potolicchio admitted that he did not know about Mr. Coassin's abnormal VNG and ABR tests at the time, he also testified that had he seen the testing results, it would not have changed his evaluation of the MRI. After reviewing the MRI and talking to Mr. Coassin, he testified, he believed Mr. Coassin most likely had BPV because his symptoms were episodic and not progressive. He told Mr. Coassin he was fine, and he did not recommend any further testing or evaluation. He took no notes on his conversation with Mr. Coassin. Mr. Coassin's wife, Emily Coassin, testified that when Mr. Coassin got off the phone with Dr. Potolicchio, he started dancing around the room, pointing at his daughter and saying "my brain's better than your brain." She added, he was relieved; everything was fine.

Dr. Potolicchio never communicated his analysis to Dr. Hirokawa. However, Dr. Hirokawa testified that had Dr. Potolicchio done so, he would not have referred him to any other doctors or given him any additional treatment.

Five months later, in November 2012, Mr. Coassin was diagnosed with a brain tumor, which appeared on a second MRI taken at that time. On July 8, 2013, Mr. Coassin passed away.

### B. Principal's Contestability Review

Following Mr. Coassin's death in July 2013, Nathaniel Berns, the principal contestability reviewer at Principal at the time, conducted a contestable claims review (as is Principal's policy if any policyholder dies within two years of obtaining his or her policy). As part of that process, an outside vendor named Broyles gathered Mr. Coassin's medical records for the prior ten years, obtained Mr. Coassin's driving records, and interviewed Ms. Coassin about her husband's medical

8

history. (*See* Pl.'s Trial Ex. 30 & 51.) On September 24, 2013, those files were delivered to Mr. Berns for his review. On October 15, 2013, he wrote his report, recommending that Mr. Coassin's claim be denied and his policy rescinded as void *ab initio* on the basis of material misrepresentations. (*See* Berns Report, Pl.'s Trial Ex. 31.) He concluded in the report that had Principal known the true answers to its application questions as of April 17, 2012, when Dr. Hirokawa recommended the basic audiometric test, the VNG test, and the ABR test, it would have postponed its decision regarding whether or not to issue the policy; as of May 8, 2012, when the testing was performed, it would have postponed its decision pending the results of the tests; as of May 31, 2012, it would have postponed again, pending the MRI results; but on June 2, 2012, when Dr. Hirokawa recommended a neurology consult, it would have declined. (*Id.* at 3.) He explained at trial that as of that date, Principal would have determined that Mr. Coassin's dizziness was not "fully investigated." In addition, he noted in his report, "[w]e would have required records showing complete resolution of the ongoing symptoms with any future application." (*Id.*) He attached to the report the Swiss Re guidelines (utilized by Principal) relating to vertigo.

Mr. Berns testified that although he had seen Dr. Hirokawa's June 2, 2012 note recommending that Mr. Coassin seek a neurology consult, as well as his notation of "brother-in-law," he did not reach out to Dr. Hirokawa to find out who the brother-in-law was, or if Mr. Coassin ever sought a neurology consult.

### C. Relevant Guidelines

The Swiss Re guideline that Mr. Berns attached to his report states in relevant part:

**Description**
. . . True vertigo suggests a disorder of the balance mechanism (the vestibular apparatus or its connections within the brain). It is important because it may reflect serious disease, i.e., stroke, demyelination (multiple sclerosis) or tumor. . . .

9

> Positional vertigo is a benign but inconvenient problem in which vertigo is precipitated by positioning the head to one side while recumbent. It occurs spontaneously and may last weeks or months before resolving. . . .
>
> **Signs and Symptoms**
> Vertigo is usually paroxysmal with distinct episodes. The most characteristic of these is positional vertigo where head movement or change of position brings about attacks, but it may occur without head movement with tumors or ischemia of the brain stem. . . . If due to demyelinating disease, stroke or tumor there may be abnormal neurological findings.
>
> Vertigo may be reproduced by movement of the head (Hallpike-Dix maneuver) and nystagmus observed. If the maneuver is positive, positional vertigo is the most likely cause. . . .
>
> **Investigations**
> If there is uncertainty about whether symptoms indicate syncope or vertigo, the work-up may need to investigate both possibilities. A resting EKG is simple but 24 hour EKG monitoring (Holter monitoring), tilt table or stress testing may be needed.
>
> Additional tests for vertigo include MRI (to show brain stem and vestibular structures), audiometry, and testing of vestibulocular reflexes with the caloric test (inducing normal nystagmus with irrigation of the tympanic membrane with warm or cold water).

(Swiss Re Guidelines Vertigo, Defs.' Trial Ex. 508 & Pl.'s Trial Ex. 42 at 2.)

The Swiss Re guidelines also include a table, listing possible outcomes for different circumstances. (*See id.* at 1.) The table indicates that if the cause of vertigo is known, and that cause is positional vertigo, a policy would issue at a standard rate. (*Id.*) If the cause of the vertigo is unknown, and the symptoms have not been fully investigated, no policy would issue at that time. (*Id.*) If the cause of the vertigo is unknown, but the symptoms have been fully investigated, and it has been six months or less since the onset of the symptoms, no policy would issue at that time. (*Id.*) Finally, if the cause of the vertigo is unknown, but the symptoms have been fully investigated,

10

and it has been more than six months since the onset of the symptoms, a policy would issue at a standard rate. (*Id.*)

If a policy would "clearly" issue as "standard without the use of Healthy Lifestyle Credits" ("HLC"), a standard policy may be upgraded to a preferred rate as long as: the insured is between ages 20 and 85; has not used tobacco or nicotine during the previous year; the insured has no more than 25 debits; the insured has no personal history of cancer, diabetes, or drug/alcohol abuse within the prior ten years; no parent or sibling of the insured died before the age of 60 due to cardiovascular disease or cancer of the breast, colon, ovaries, or prostate; the insured has not driven under the influence or recklessly in the prior five years and has had no more than two moving violations in the prior three years; has a favorable HLC; and meets certain criteria for cholesterol, blood pressure, and build. (TUG Guidelines re Preferred, Defs.' Trial Ex. 507 at 1.) There is no dispute that Mr. Coassin met all of these criteria, such that if Principal would have issued him a policy at all, it would have been at a preferred rate.

The TUG guidelines, another set of guidelines relied upon by Principal, list the time limits for various requirements. (*See* TUG Guidelines re Timing, Defs.' Trial Ex. 515 at 3.) These state that an application is valid for three months from its completion date (though that time can be extended at the underwriter's discretion, and according to Mr. Berns, the underwriter can use his judgment in determining whether the three months should start from the date of the original application or an amendment) and exams and other tests are valid for one year from their completion date for insureds, such as Mr. Coassin, under the age of 70. (*Id.*)

### D. Whether Principal Would Have Issued the Policy had it Known the True Facts

Principal, primarily through Mr. Berns, offered three reasons that it would have declined to issue Mr. Coassin a policy: (1) the cause of the vertigo was unknown and not fully investigated;

11

(2) Mr. Coassin's symptoms were ongoing; and (3) the possibility that Mr. Coassin had a central nervous system lesion, as well as concern over the white spots on Mr. Coassin's MRI.

### 1. Cause Unknown, Not Fully Investigated

As previously noted, under the Swiss Re vertigo ratings chart employed by Principal, if the cause of vertigo is unknown and it is not fully investigated, Principal declines to issue a policy at that time. (*See* Swiss Re Guidelines Vertigo at 2.) Principal contends that the cause was unknown because Mr. Coassin's vertigo had not been definitively diagnosed as BPV. The Court agrees. Although Dr. Galante's December 15, 2011 notes indicate that he had diagnosed Mr. Coassin with "recurrent BPV" (*see* Galante Record Dec. 15, 2011 at 2), when Mr. Coassin's symptoms returned in April 2012 and further testing was conducted, Dr. Hirokawa testified that he could not diagnose him with BPV, and Dr. Hirokawa's records do not show a diagnosis of BPV (*see* Hirokawa Records, Defs.' Trial Ex. 505). The Court thus finds that Mr. Coassin's vertigo was properly categorized as "cause unknown."

The Court is not persuaded, however, that Mr. Coassin's vertigo was not fully investigated by June 2012. Mr. Berns's testimony that "fully investigated" is defined as "no ongoing symptoms" is belied by (a) the vertigo life ratings chart itself, (b) Mr. Berns's own prior testimony, and (c) common sense. Under the "fully investigated" category in the Swiss Re chart, there are two options: (a) symptoms for six months or less and (b) symptoms for more than six months. (*See* Swiss Re Guidelines Vertigo at 2.) Both categories presume that the symptoms are ongoing; it is only a question of how long it has been since their onset. Indeed, in his deposition testimony, Mr. Berns defined "fully investigated" as "no ongoing referrals" or "recommendations to see additional

12

physicians"—a definition which comports with common usage and the dictionary definition of the term "fully investigated."[5]

Under this definition, it is apparent that Mr. Coassin's symptoms were fully investigated by around June 5, 2012, after he had obtained a neurology consult from his brother-in-law. By that time, Mr. Coassin had had all of the testing recommended in the Swiss Re manual (*see* Swiss Re Guidelines Vertigo at 2), and he had no outstanding recommendations for referrals, further evaluation, or treatment.

Mr. Berns testified, however, that even applying this definition, Principal would have declined to issue the Policy because of the June 2, 2012 recommendation by Dr. Hirokawa that Mr. Coassin see a neurologist. It is apparent that Principal would not have issued the policy on June 2 for that very reason, but it not clear why, having found that Principal would have postponed its decision regarding whether to issue a policy on April 17, on May 8, and on May 31, Mr. Berns believed that Principal would have been unwilling to postpone its decision an additional two or three days to allow Mr. Coassin to obtain a neurological consult. Under the TUG guidelines, Mr. Coassin's application would have been valid until at least July 9 or 25 (depending on whether the date of the original application or the amendment and supplement were used as the starting date) (*see* TUG Guidelines re Timing at 3), and Mr. Berns failed to offer a persuasive explanation for his view that Principal would have declined the policy by June 2.

Had Principal waited a few extra days to permit Dr. Potolicchio time to review Mr. Coassin's MRI, it would have learned that in Dr. Potolicchio's view, no further referrals, treatment,

---

[5] Merriam-Webster defines "investigate" as "to observe or study by close examination and systematic inquiry." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/investigated.

or evaluations were warranted. Mr. Berns testified, however, that he would not have relied upon Dr. Potolicchio's opinion even if he had obtained it because (a) Dr. Potolicchio was a family member, so he was likely biased, (b) Dr. Potolicchio had not created a written record of his conversation with Mr. Coassin, and any ex post facto record he created would not be reliable, (c) Dr. Potolicchio did not examine Mr. Coassin, and (d) Dr. Potolicchio did not have the May 8 test results when he reviewed the MRI.

In the Court's view, the first of these reasons, Dr. Potolicchio's bias, actually cuts against Principal's claim. As a family member, Dr. Potolicchio had every reason to be diligent and cautious in his consultation. Had he suspected there was even a chance that Mr. Coassin had a serious medical condition, he surely would have recommended that Mr. Coassin follow-up with him or another physician. Instead, Dr. Potolicchio found no reason for concern, as vividly illustrated by Ms. Coassin's testimony about Mr. Coassin's celebratory dancing when he got off the phone with Dr. Potolicchio.

Likewise, the fact that Dr. Potolicchio was a family member lends credence to his testimony that even without notes of his conversation with Mr. Coassin, he could have produced a written record of the conversation months afterward. It is unlikely that a doctor who reviews his brother-in-law's MRI, only to learn that a second MRI taken just months later showed a brain tumor, will forget his review of the first MRI and his conversation with his brother-in-law. Further, as Don Kelley, Defendants' expert, and Mr. Berns himself testified, insurers sometimes ask doctors for narrative reports of information provided to patients over the phone, and that could have been done here. Indeed, the TUG guidelines include a section on attending physician statements ("APS"), under which underwriters are instructed:

14

> The decision to order an APS for cause should be based on the proposed insured's medical and non-medical history as developed in the underwriting review process and the particular circumstances of each case. Use judgment and order APSs on cases that require further risk assessment. . . . If information is missing in the APS received, underwriters can work through the APS vendor to obtain the necessary records or contact the doctor's office staff directly for assistance. If the APS vendor did not provide the APS, you may choose to work with either the producer's office or call the physician/clinic directly.

(TUG Guidelines re APS, Defs.' Trial Ex. 514 at 5–6.) Mr. Berns offered no reason an APS could not have been requested here.

Nor is the Court persuaded that Principal would not have accepted Dr. Potolicchio's opinion because he did not examine Mr. Coassin and he did not have the May 8 test results when he read the MRI. Dr. Potolicchio testified that had he examined Mr. Coassin, he would have performed the same tests that had already been done by Dr. Hirokawa. Similarly, he testified that had he had the May 8 test results, it would have made no difference to his conclusion. Principal did not offer any testimony from any medical expert or doctor to contradict this testimony, and the Court finds it to be credible. As such, the Court concludes that Principal would not have declined to issue Mr. Coassin a policy on the grounds that the cause of his vertigo was not fully investigated.

### 2. Symptoms Ongoing

Principal next contends that even if it had determined that Mr. Coassin's vertigo was fully investigated, it still would not have issued him the Policy because he had ongoing symptoms. Although, as discussed above, the Swiss Re manual permits the issuance of a policy even if symptoms are ongoing, Mr. Berns testified that underwriters are not obligated to follow the Swiss Re guidelines. This testimony is, simply put, not credible. Even Lynn Patterson, Plaintiff's expert, testified that though the experience of underwriters does come into play in applying the Swiss Re

15

guidelines, it is generally expected that underwriters will follow the guidelines. Such a rule makes sense because, as Don Kelley explained, the guidelines enable the insurer to price policies; if underwriters do not follow the guidelines and instead utilize their discretion in determining the amount of risk the company will take on, the insurer is unable to consistently price its risks. Because the Court finds Defendants have proved by a preponderance of the evidence that underwriters are generally bound to utilize the guidelines, and the guidelines clearly permit the issuance of policies to individuals with ongoing symptoms, the Court concludes that Principal would not have declined to issue a policy on the basis of ongoing symptoms.[6]

### 3. CNS Lesion & White Spots on MRI

Principal's final rationales for declining the Policy are that the May 8 tests revealed a sign of a possible CNS lesion and that the May 31 MRI revealed white patches. However, as Plaintiff's expert testified, the appropriate follow-up for the possible CNS finding was an MRI, and as Dr. Potolicchio testified, the MRI showed no signs of a lesion. Likewise, Dr. Potolicchio, the only doctor who reviewed the MRI to testify at trial, stated that the "tiny white spots" on the MRI were "very common" and nothing to worry about. Principal did not offer the testimony of any medical professional to rebut this conclusion.

---

[6] Ms. Patterson and Mr. Berns testified that because the amendment and supplement focused on symptom resolution, the fact that Mr. Coassin's symptoms had not resolved was enough to find that a policy would not have issued. This testimony, however, relies on a standard of materiality that this Court has already rejected: namely, that any response to any question on an insurance application is conclusively material. As noted earlier and as explained in depth in the Court's ruling on the motion for summary judgment, the Court here instead applies a presumption of materiality. Defendants must rebut that presumption, but once they have done so, Principal must do more than simply point to the language of the supplement and amendment.

In light of these findings, the Court concludes that Defendants have proved by a preponderance of the evidence that Principal would have postponed its decision, rather than declining on June 2; that it would have sought a written statement or APS from Dr. Potolicchio; that upon receiving this statement, it would have issued a policy under the cause unknown/fully investigated/symptoms ongoing for more than six months rubric; and that it would have issued the Policy at a preferred rate. The Court thus holds that Defendants have successfully met their burden of rebutting the presumption of materiality and proving that Mr. Coassin's knowing misrepresentations were not material.

### E. Breach of Contract

To prove a claim for breach of contract in Connecticut, a plaintiff must show: "(1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the opposing party; (4) direct and proximate cause; and (5) damages." *McMann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503–04 (2006). The only element that is in dispute in this case is breach of the agreement. Because the Court has found that Defendants have proved by a preponderance of the evidence that Mr. Coassin's knowing misrepresentations were not material, Principal did not have a right to rescind the contract, and its failure to pay on Defendants' claim was a breach of the parties' contract.

III. Conclusion

For the foregoing reasons, judgment is entered in Defendants' favor on both Principal's claims and Defendants' cross-claims. Principal is ordered to pay damages to Defendants in the amount of $10,000,000. Further, the Court declares that:

1. Mr. Coassin did not make material misrepresentations in his application for insurance;

2. Principal wrongfully denied Defendants' claim under the Policy; and

3. Principal wrongfully rescinded Mr. Coassin's policy.

Judgment shall enter accordingly, and the Clerk is requested to close this case.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of July 2016.